behalf of Christopher Weish. The Supreme Court's mandate in the Tell Labs case is clear. As Judge Rakoff wrote in his Munster Worldwide case, the emphasis on consideration of all, emphasis on all, facts in a complaint is not permitted. One must look to all facts. And then one must look to the facts completely, must take them collectively. The District Court in this case did neither. As a first matter, the District Court ignored completely AU316 or what are commonly called SAS99 filings. Those are auditor investigation of fraud risk to determine whether what occurred was intentional conduct or error. The Court will note that neither we nor our friends on the other side cited any case that deals with SAS99. That is fascinating to me. In 25 years, I haven't seen disclosure like this, where the auditor seems to have insisted that the company in its SEC filing disclosed that evidence of fraud. The audit committee in this case charged with investigating what occurred found that those, the auditor's investigation and the implications were well founded. Its denial of fraud, this Court shouldn't consider for two reasons. First, if you allow this company simply to say, we committed no fraud in the face of its disclosing the SAS99 allegations, then anyone can self-exculpate. Sure, we did wrong and there are a thousand things we may have done wrong, but there's no fraud here. There's nothing to see. This is the subtlety here. Deloitte's job is not to determine whether as a legal matter there is fraud. That's clear. We have cited the standard for AU316 in our brief. What They asked those questions and received answers that showed, it must be material because it's here, that showed intentional conduct that led to the restatement. So, Deloitte's job is not to say to us, to the Court, to anyone, there is fraud as a matter of law here. If there is a fact of fraud, would it be intentional to discredit Deloitte's lawful product of the development of safety and security procedures? Not at all, Your Honor. Yes. Yeah, well, so Then you have an accounting mistake by a legal company. Not at all, Your Honor. Accounting mistakes occur. My friends have pointed out, and this is true, that GAP is not rote. It's not binary. It's difficult. It's very difficult. That is true, and mistakes do get made. Those are the cases, Your Honor, where the courts have ruled that a restatement alone, which is an admission of a mistake, is not sufficient itself to plead fraudulent intent, full stop. The issue here is these SAS99 allegations, which, again, neither side has found a case indicating that another issuer had said, Alrodner has found the following. Here, what they have found is coercion, the pressure to change journal entries. These are indicia of fraud, and that's what distinguishes them from the mistake that you would find in a restatement case where a court could say, absent more, the mistake itself does not constitute fraud. So we are by no means asking this court to upend that precedent. That is correct. If there's no... This was going on, as I understand it, for years. What was the motive to do it before the company went public? Your Honor, I refer you to your Silvercorp case, which is 26F sub 3rd, 266. In that case... I was just a kid when I wrote that. What's that? Go ahead. F sub 3rd, Your Honor. So in the Silvercorp case, Your Honor, you'll recall that there was a motive connected to a $117 million offering by this Chinese mining company. And what had produced some reports on this company and its feasibility in close proximity to this offering. I ask you to... Part of the holistic analysis in this case, Judge Rakoff, should include exactly what you did in Silvercorp. Even if the motives here are themselves insufficient, what else is there? In this case, just as in Silvercorp, you'll recall that both former employee 1 and former employee 3 have alleged that the company was attempting to become SOX and GAP compliant, indicating knowledge on the part of the CEO and CFO prior to the offering, at least two years prior to the offering. The two years of financials prior to the offering were fraudulently stated in our opinion, but certainly misstated as the companies conceded. A very large, two very large investors cashed out in the IPO and the SPO in 2014. One of the directors from one of those venture capital firms actually sat on the audit committee of the company. So the motive is to go public, Your Honor, because on the board of this company are three, no fewer than three, directors who are affiliated with venture capital firms that were able to sell out a substantial portion of their positions, hundreds of millions of dollars, Judge Rakoff. So essentially, that I think they are, Your Honor. If my memory serves me correctly, Your Honor, there... No, no, not at all. There were shares, if my memory serves me correctly, that were implicated after his sale in May that he received by option. That's my memory of the situation. We stand by the 10% calculation. This is a matter of record that is in the forms for, which are before the court. But in any event, Your Honor, can I say 10% itself may be marginal, Your Honor, may I ask you to check? May be marginal in terms of Mr. Sturgeon's stock sales. But if you look at them in the context of the timing, which is another thing, it's timing or amount, suspicious in timing or amount, the timing of these sales and of Mr. Fussler's sales, who's not infected because he did not speak, is suspicious. The auditor was on the ground completing its audit in late May of 2015. Mr. Kilpatrick did not sell, Your Honor. Right. Which does not mean, Your Honor, as courts have ruled in this circuit, that does not necessarily mean that one, that two senior employees who did sell do not constitute suspicious in timing or amount. But if I may, again, if you look at this holistically, even if Mr. Sturgeon's sales are not themselves sufficient, even if the fact that the company paid bonuses that it ultimately clawed back is not sufficient, even if the fact that but for the false financial statements, the company would have defaulted on its debt, all of these things, concrete benefits to individuals in the company as opposed to potential benefits, which we all know are not sufficient, even if together each of those things is insufficient, the question remains is are they collectively, and I'll refer you back to your Silvercorp case, Judge Rakoff, are they collectively sufficient in the context not just of the motive allegations, but of all of the allegations of fraud in this case, starting with the SAS-99 allegations? Mr. Sturgeon.  Mr. Sturgeon. Mr. Sturgeon. Mr. Sturgeon. Mr. Sturgeon. Mr. Sturgeon.  Mr. Sturgeon. Mr. Sturgeon. Your Honor, one infers the answer. The SAS-99 analysis, the investigation, the fraud risk analysis through which an auditor goes is very long. There are many questions they ask about it. There's no reason to have stated these questions unless they found answers in the affirmative. If they hadn't, Your Honor, they should not have put these questions in this 10-K. The fact is that the audit committees acknowledging that these allegations were well-founded itself indicates that there were, even if you take the word coercion out, Your Honor, there was at least pressure to change journal entries. And I ask you, who coerced whom here? Is it in any mid-level finance staff personnel's benefit? Yes, Your Honor. Whether they or anyone known to them had ever been asked to record a journal entry or adjustment without proper authorization or support, whether they or anyone known to them had ever been asked or coerced to record a journal entry or other adjustment with which they were uncomfortable, or were they aware of any inappropriate journal entry or other adjustment in the entity's financial records? The only implication here is that these questions were answered in the affirmative. Otherwise, there's no reason to put this in. And in answering those things in the affirmative, I ask again that in the context of a court's having to determine whether an inference is cogent and equally cogent and compelling as anything our friends concoct, the question here is, what is the inference from these allegations? And again, Your Honor. Those instructions related to SOX and GAAP compliance, Your Honor. Right. But no, FE1 is talking more generally about SOX and GAAP compliance. And the fact that the company's attempt to become GAAP and SOX compliant was something that FE1 believed Clopati and Sturgeon were aware of. She also says, Your Honor, that she, a lower level employee, an accountant at a plant, told the defendants that they were doing things wrong. I beg your pardon. I'm so sorry. I misspoke. Told the finance staff that they were doing things wrong, including with respect to leasing, Your Honor. And in that instance, they said, get used to it. We apply Sturgeon-accepted accounting principles, not GAAP. You know, if you take that with, because, Your Honor, paragraph 48, the bottom of paragraph 48. So if you take FE1's allegations and you look at them, Your Honor, as Freud says, in all jokes there is truth. There's no reason for someone to say, ha-ha, it's Sturgeon-accepted accounting principles, unless for some reason he or she believed that Sturgeon was the font of the company's failure. And if I may, if you take just one of the accounting instances, this begins to wrap up and congeal into a very compelling, cogent inference of fraud. Look at the lease accounting. FE1 knew that the trucks were likely capital items that should be capitalized and not expensed, but they told her to expense those trucks. They also told her to expense flooring tiles in an office, which can in no way be considered an expense. The company, according to FE1, was attempting to push as many expenses as possible, I'm sorry, looking to expense as many capital items as possible. And so, far from just having a bold allegation of a lease accounting problem, the complaint actually details that this is standard operating procedure of the company. And so, there are an aggregation of allegations here, which, when taken together, certainly form a cogent and compelling inference of CFPB. Yeah. Good morning, Your Honors. May it please the Court, my name is Joe Weinstein. I represent Advanced Drainage Systems. I speak this morning on behalf of all appellees. Your Honors, this is a typical restatement case that doesn't present any novel issues or facts. It's a classic case of attempting to plead fraud by hindsight, the very kind of case that the PLSRA was designed to correct. And in this case, the PLSRA did just what it was designed to do. The District Court correctly considered the allegations of the amended complaint holistically and properly concluded the plaintiff had not clearly particularized facts that allow for a strong inference of scientific. On that basis, this Court should affirm. The Court plaintiff argues that the Court did not sufficiently holistically consider the facts because she looked at the facts individually. That, unfortunately, for a plaintiff, is not the case. The Court looked at individual facts and individual allegations to see whether they were particularized. When she found that they were particularized, she considered them together holistically. The plaintiff argues for a new standard, one that no court has ever adopted, that essentially would allow conclusory allegations to be stacked on unwarranted inferences, to be stacked on ... Well, it doesn't take force, Your Honor. As Your Honor pointed out, that particular question said, coerce or ask to put in an entry that they were uncomfortable with. So there's no basis to argue about any testimony from anyone or any allegations specific to anyone. Well, what about just on the point we're discussing, paragraph 48, that your adversary just referred to, according to one of the confidential informants, FE1 pointed out to superiors at ADS corporate headquarters that they required accounting treatment, that the company required accounting treatment that was improper. FE1 superiors in ADS corporate accounting function told FE1 to get used to it. FE1 recalls that corporate accounting personnel often joked that ADS did not follow GAAP, but rather SAP or Sturgeon approved accounting principles. So, at least in the first part of that, there's a specific allegation that the improper accounting was brought to the attention of superiors who totally brushed that aside and basically said, suck it up. Well, Your Honor, first, it's unclear from those allegations whether this was improper characterization of the particular issues that are the subject of the statement. But even if it was, there's no allegation whatsoever that it was brought to the attention of the defendants, the individual defendants or any other senior management. Well, I grant you that that's maybe a serious problem, but at least here it says FE1 pointed out to superiors at ADS corporate headquarters. Now, yes, that paragraph 48 does not mention who they are, but it does identify that they were superiors. They may have been superiors, but as plaintiff's counsel has admitted, this was a low-level accounting employee and pointed out a disagreement about how an expense was characterized. Now, are you saying that if, supposing that sentence had read, I brought it to the attention of Mr. X, one of the individual defendants here, and he told me to get used to it, in your opinion, would that be sufficient then to sustain the complaint? It would be better, but I don't think it would be sufficient necessarily because this gap in treatment was very complicated, as the court below found. It's a multi-factor test. It's been under reconsideration by the accounting powers that be, and they've changed over time how they characterize it, and even the nomenclature is confusing because what happened here was there was a change of operating leases, which is the way that some of them were characterized, to capital leases. Operating leases are capitalized and amortized. Capital leases, for whatever reason, are expensed. The complaint alleges that it made the difference between default and non-default. What about that? Oh, on the debt covenants? Yeah. That's one of the very common motivations, Your Honor, that has been found not to be subject to a finding of scientific purported, unless there's something more. But the fact is that, as the court below said, there are inferences that plaintiff draws that are untoward that the, for example, that those debt covenants would have been violated had they not been renegotiated. And the fact is they were renegotiated, if you look at the timing, even before any restatements were made, months and months before the restatements were made. In fact, the willingness of the lender to renegotiate seems to create some tension with the allegation that there's a problem with them. Do you concede that they were defaulted on the debt covenants? There's no evidence. I'm sorry, Your Honor. There's no evidence whatsoever that they were defaulted on the debt covenants. There's no evidence of that, Your Honor. And there's no allegation of it, even more importantly. So, before going public, ADS cautioned prospective investors in its prospectuses that, among other things, it was not surveillance-optically compliant, and it didn't need to be because there is an exception for newly public companies, that its financial controls might not be adequate, and that its lease accounting might be subject to change in the future, all things that ultimately came about. In talking about some of the things that were raised by plaintiff's counsel, the stock sales, it actually is 2.65 percent. During the two-week period when there were two sales, there was also a purchase. But whether it's 2.65 or 10.1 percent, it's the same. The amount of shares is not unusual, and, therefore, it doesn't trigger a merger. The fact that Mr. Clapney did not sell any shares also undermines the idea that there is some issue with respect to sales by Mr. Stern. Further, the timing is not unusual at all. The bonuses were a whole different issue, Your Honor, and shifting to that, with respect to the bonuses, they were awarded based on the understood financial performance of the company. When it came to light that there had to be some restatement made, and long before the determination of what that restatement would be, as a matter of, I think, good corporate conscience, management, as part of the complaint, by the way, management suggested to the board, recommended to the board, that they simply return the bonuses, which they did. That's not fraud. That's good corporate governance. So, with respect to the other allegations of conscious disregard, et cetera, there is no allegation whatsoever that any of these red flags, contemporaneous reports, et cetera, came to the attention of any of the individual defendants. There is no allegation that these SAS-99 responses in June 2018 provided any information that was otherwise known to anyone at the time the statements were made. And recall that this is a question of sciatica, whether anybody acted with an intent to deceive or defraud at the time the statements were made back in 2014 and early 2015. And there's no indication that that's happened at all. Back finally to this point about the stock sales and the timing with respect to Mr. Sturgeon, he sold his stock in May of 2015. As the allegations of the complaint made clear and as the company's disclosures made clear, the SAS-99 questionnaire responses didn't come until June and the investigation didn't start until June. And this idea that because the accountants were somehow in the midst of their audit is a bit of a red herring because four years prior, Deloitte had signed off on the accounting statements of the company and found them to be GAAP compliant. And indeed, the court below characterized that as not a red flag but a green light. And if Deloitte couldn't see this and didn't understand that there was an issue there, why would any deemed it the rule of defense? Your Honors, thank you very much. Thank you. Just as a matter of information, my colleague says there are no allegations about default on debt covenants, paragraph 226 at A115. As disclosed in the restated financial statements, had ADS properly followed GAAP with respect to leases, it would have been in default of its affirmative and negative financial covenants with its lenders, as evidenced by the fact that ADS was required to modify these definitions on a go-forward basis and obtain a waiver of its historical defaults. These are events of default, not necessarily something that cannot be renegotiated. But the question here with respect to motive is whether there is something concrete versus something potential. If it's potential, it's insufficient. If but for the fraud, they would have had to state in their IPO and SPO prospectuses that they were in default, then it is a motive that should suffice. If but for the fraud, they would not have made certain bonuses that they were paid, and there was a callback in this case, that likely suffices. The question here is, it's not just one of these. It's many of these motives that show something concrete instead of something potential. My colleague states that there's no evidence that any... I beg your pardon. I beg your pardon. Thank you, Your Honor. There's no allegation that this is a top-down fraud. First of all, there's no allegation and nothing in any SEC filing that says a plant manager in Peoria, Illinois, did something wrong. Someone in our German subsidiary violated the Foreign Corrupt Practices Act by paying a bribe. There's no allegation that this is something of which the senior executives couldn't have been aware. But when you... On the contrary, Your Honor, there are allegations in particular in paragraph 48 and also later on in paragraph 178 that this is a top-down problem, that the tone at the top... Yes. So, we don't know... What we know, Your Honor, is that the end of the field audit work occurred probably sometime around March 31st, between March 31st and June 1st. We know that sometime in early June, the audit committee commenced an investigation. We also know, Your Honor, as you know, that there are back and forth between accountants and companies all the time as the audit field work has come to a conclusion. And therefore, it is... It is equally cogent and compelling that they were aware of these responses during May. This is a tone at the top. Your Honor, I point you again, Judge Rakoff, to your Silvercorp opinion in which you found that even though the complaint did not plead scienter against the senior executives, that it was likely that this reached to a... that the fraud reached to... the alleged fraud reached to a level of the corporation which allowed you to, looking at all the allegations holistically, infer a cogent and compelling inference that the company committed fraud. We believe that at least Defendant Sturgeon is culpable here and the complaint pleads it. But certainly, this is not a bottom-up fraud. It is a top-down fraud, and that is what Deloitte seems to have found. Why should we pay any attention to an opinion issued by a district judge? Your Honor, in scouring the Court's opinions, I found what I found, and I'll leverage what I've attempted to leverage. Thank you.